IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 8, 2008 Session

**STATE OF TENNESSEE v. ANTHONY POOLE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-02290     James C. Beasley, Jr., Judge**

**No. W2007-00447-CCA-R3-CD  - Filed April 14, 2009**

A Shelby County jury convicted the appellant, Anthony Poole, of second degree murder, and the trial court sentenced the appellant to twenty-four years in the Tennessee Department of Correction.  This appeal followed, with the appellant arguing that the trial court erred by (1) failing to instruct the jury to disregard a hearsay statement by the victim; (2) excluding the testimony of a mental health expert; (3) giving a sequential, "acquittal-first" instruction to the jury; and (4) imposing a twenty-four-year sentence in contravention of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).  Upon review, we modify the appellant's sentence to nineteen years.  In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed as Modified; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Anthony Poole.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Wax and David Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In March 2005, a Shelby County Grand Jury returned a three-count indictment charging the appellant with one count of premeditated first degree murder and two counts of felony murder.  The State dismissed the felony murder counts prior to trial.

At trial, Josie Lee Moss, the mother of the victim, Verline Fason, testified that the victim was forty-eight years old at the time of her death on August 7, 2004.  At that time, the victim lived at

5314 Piper's Gap in Memphis with her seventeen-year-old daughter, Josie Dominique Fason. Moss said that she and the victim usually talked several times a day. On the morning of August 7, 2004, the victim called at 8:15 and asked if Moss had just called her. Moss told the victim that she had not. The victim explained that she made the inquiry because "all the phones is off the hook." As the victim was talking to Moss, the telephone connection "cut off."

Moss became concerned when the victim did not call her back. She repeatedly attempted to call the victim, but she kept getting a busy signal. At 9:10 a.m., Josie Dominique Fason called Moss. Fason was screaming and crying, and she told Moss that the victim had been murdered. Fason told Moss to come to the victim's house. When Moss arrived, law enforcement officers were already present and would not let Moss into the house.

Josie Dominique Fason testified that in August 2004, she had graduated from high school and was working as a catering assistant at St. Francis Hospital. Fason stated that a week or two prior to the victim's death, Fason had ended a one-and-a-half-year relationship with the appellant. Fason opined that "[i]t was a pleasant breakup." Fason stated that the victim had not approved of her relationship with the appellant but that she had never been openly hostile to him. Fason said that after the relationship ended, she did not keep anything that belonged to the appellant and the appellant did not have anything belonging to her. Additionally, she said that after the breakup, the appellant did not have permission from her or the victim to come to their home.

Fason testified that when she left the house in the afternoon of August 6, 2004, the victim was in her bedroom. Fason and her boyfriend, Detario Jones, spent the night with Jones' aunt in Fayette County. The next morning, Fason went home to get clothes for work. When Fason entered the residence, she saw the victim lying on the floor, bound with a telephone cord and a "bungee cord." Fason said that the telephone cord and the bungee cord were from the victim's house. Fason explained that the victim delivered newspapers and that she used bungee cords to wrap the papers. She usually kept the bungee cords in the garage. Upon discovering that the victim was dead, Fason ran to the kitchen and called 911. She saw dried blood on the kitchen telephone and on a steak knife that was on the kitchen floor. The knife was from the victim's kitchen.

Fason stated that the victim carried a gun in her purse for protection and that she also kept a black, long-barreled BB gun in her dresser drawer.

Fason acknowledged that she and the appellant had cared about each other and that he had given her a diamond ring. She also acknowledged that during an argument, she threw the ring out her bedroom window. She did not recall giving the appellant a ring.

Officer Newton Morgan of the Memphis Police Department testified that on August 7, 2004, he went to the victim's residence to investigate a homicide. When he entered the victim's home, the victim's body was on the floor. Her left arm was tied with a telephone cord to an overturned chair, and her right arm and both wrists were tied with telephone cord to the staircase. Officer Morgan stated that a bloody knife was found on the kitchen floor near the door to the carport.

Officer Nathan Gathright of the Memphis Police Department testified that the appellant's fingerprints were on the handle of the knife found on the victim's kitchen floor.

Memphis Police Lieutenant Lezley Angela Currin testified that on August 8, 2004, she met with the appellant at the homicide office. Lieutenant Currin recalled that the appellant had several injuries on his arms and his hands. The injuries looked like cuts, scrapes, scratches, and punctures. Lieutenant Currin asked the appellant how he had been injured, and he explained that he had fallen in his backyard. The appellant denied any knowledge of the victim's murder and said that he had not been at the victim's house since August 1, 2004.

During the meeting, the appellant gave Lieutenant Currin consent to search his home. On August 9, 2004, Lieutenant Currin, Officer Davison, and Sergeant Sims went to the residence the appellant shared with his mother. While waiting for the appellant's mother to arrive, the police looked through a trash can that had been pushed to the curb. In the trash can, they found two t-shirts that appeared to be stained with blood. One shirt was in a black, plastic trash bag, and the other shirt was underneath it. One of the shirts had a cut on the lower front of the shirt and a puncture and blood stains at the lower back of the shirt.

After the appellant's mother arrived, she allowed police to search the residence. In the appellant's bedroom, police found a pair of tennis shoes near the bed. A pair of shorts and a t-shirt found in the closet had stains which appeared to be blood.

Agent Qadriyyah Debnam with the Tennessee Bureau of Investigation Crime Laboratory testified that the tennis shoes collected from the appellant's home had spots of blood on them. The appellant's right shoe did not have enough blood for comparison, but the blood found on the appellant's left shoe tested positive for the victim's blood. Agent Debnam said that the blood on the kitchen telephone was the victim's. Additionally, Agent Debnam said that the blood on the blue t-shirt was a mixture; the major donor was the victim and the appellant could not be excluded as the other donor. The blood on the tip of the knife found in the kitchen came from a mixture of multiple donors. She said that the amount of blood on the tip of the knife was insufficient for a conclusive comparison but that the appellant and the victim could not be excluded as donors. Agent Debnam stated that the blood on the handle of the knife tested positive for the victim's blood.

Memphis Sergeant Barry Hanks testified that on August 9, 2004, after the appellant was apprised of his rights and informed that his fingerprints were on the murder weapon, he gave a statement to police implicating his involvement in the homicide. According to the appellant, the victim's stabbing was an accident. In his statement, the appellant said:

> My momma picked me up Friday night and we went to the house. I smoked a couple of blunts by myself and fell asleep for a minute. Then as I woke up, it was like my conscious [sic] was talking to me telling me, my intentions were to go over there and give [Fason] the ring back and tell her that I understand that she didn't want to be with me anymore and that she lost interest in me or whatever. I never told her that, this is what I was thinking, my

conscious [sic] was telling me that. When I made it over there, she wasn't there. But I still knocked on the door because her mother [the victim] was there and tell me her mother [sic] to let her know that I came up over there to give the ring. I couldn't get my words out because she just went off on me because she had a real attitude problem with me. I ain't never know that she didn't like me, but I didn't know until she started going off on me when I was at the door. Then she was saying about the little conversation we had a little while back, me, her, her daughter [Josie Dominique Fason] and her nephew Anthony had. They were telling me to support [Fason]. She was just saying that "you ain't no good, you ain't trying to help her[.]" Then after that she just went off. She went upstairs and got her purse. She came back down the steps. [I] knew she always have her gun on her or in her purse. I got real nervous then. She was still talking stuff and she was coming down. She then went in the kitchen and when she came back out she had a knife in her hand. She was telling me to get out and why she dislike me and all of that. Then she just swung the knife at me, and that is how I got the cut on my right finger. Then she swung at me once more. That is when the knife went in my left arm a little bit, but I grabbed the knife and then we started tossing and turning. Rolling back and forward on the floor. The knife was beside us but it was still in her possession. So I was trying to knock it out of her hand, I still had my hand on it trying to grab it. After that we were still rolling and I felt it as it was going inside of her. Then as it was coming out blood was all on my hand and on the knife. I was high, I don't know what state of mind I was in. I was still shocked and still panicking about it because she stuck me and cut me. Then I stabbed her, but I didn't really know what I was doing because I wasn't in the right state of mind. When I realized what I done, she was still breathing and I just walked out of the house. I was scared to call the police because I had my hands on the knife and you know how people think, they may have thought that I did it intentionally.

Sergeant Hanks said that the appellant did not mention tying the victim to the chair and staircase.

Dr. Amy McMaster testified that she performed an autopsy on the victim. Dr. McMaster recalled that the victim was bound with at least three different ligatures that were secured by "multiple loops or knots." The victim had at least thirty-seven "sharp force injuries" to her body, including thirteen stab wounds and two incised wounds to the neck. One of the stab wounds to the neck injured the victim's carotid artery, which could cause a person to bleed to death fairly rapidly. A stab wound to the left breast extended five inches into the body and injured the heart and lung. Dr. McMaster opined that a significant amount of force was required to inflict that wound, which was also fatal. Additionally, the victim had two stab wounds to the abdomen and six stab wounds to the back. One of the stab wounds to the lower back penetrated approximately four inches. The

-4-

victim also had six stab wounds on her arms and three stab wounds on her legs.  Dr. McMaster testified that the victim had several defensive wounds on her hands and some "small punctate wounds" that were caused by "the point of a knife or another type of mechanism."

At the conclusion of the trial, the jury acquitted the appellant of first degree murder, but found him guilty of the lesser-included offense of second degree murder, a Class A felony.  At the sentencing hearing, the trial court imposed a sentence of twenty-four years.  On appeal, the appellant raises the following issues for our review:

> I. Did the trial court commit plain error by failing to instruct the jury to disregard the testimony of Josie Moss about the decedent telling her that her phones were off the hook?

> II. Did the trial court err by excluding the proferred testimony of Dr. Angelillo?

> III.  Did the trial court err by directing the jury to proceed sequentially in its consideration of the principal charge and the lesser included offenses?

> IV. Did the trial court err by enhancing the [appellant's] sentence by the factor of 9 years when it sentenced the [appellant] to a term of 24 years?

We will address these issues in an order different than that in which they were raised.

## II.  Analysis

### A.  Expert Testimony

First, we will address the appellant's contention that the trial court erred in excluding expert testimony on the issue of the appellant's diminished capacity.  On Monday October 9, 2006, the day of trial, the State informed the trial court that the defense had just given the State a written report of a psychological evaluation of the appellant by Dr. Joseph C. Angelillo.  The State objected on the basis of Tennessee Rule of Criminal Procedure 12.2, arguing that the defense did not file a notice regarding the use of expert testimony about the appellant's mental state.[1]  Defense counsel stated that

---

[1]  Tennessee Rule of Criminal Procedure 12.2(a) and (b) provides that a defendant who intends to assert a defense of insanity at the time of the alleged crime or who intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his or her guilt shall so notify the district attorney general in writing and file a copy of the notice with the clerk.  If a defendant fails to provide notice, the trial court may exclude the testimony of any expert witness offered by the defendant on the issue of the defendant's mental condition.  Tenn. R. Crim. P. 12.2(d).

(continued...)

the evaluation was provided to the State at the "earliest opportunity." Counsel explained that a summary or a rough draft of the evaluation had been faxed to counsel's office sometime after the office closed on the Friday before trial. Dr. Angelillo's final report was submitted to defense counsel on the morning of trial. Counsel argued that "[t]he remedy [for the lateness of the notice] is continuance, not exclusion."

The trial court inquired as to the relevance of the evaluation. Defense counsel said, "[W]e [are] not going to use this as the defense. I mean, we're not saying, he did not do this because [he] did not have the mental capacity to do so." Instead, defense counsel said that they wanted "to call Dr. Angelillo so that the jury would have a better understanding of [the appellant] and the way he processes information, but it would not be an insanity defense. . . . It . . . would show how he thinks things through so the jury could appreciate any premeditation, any voluntary manslaughter type information that would be out there."

When the trial court requested further clarification of the purpose of the testimony, the following colloquy occurred:

> The Court: So this goes to his mental state. It's a mental defense.
>
> [Defense Counsel]: Yes, it is in that respect. It's not one of the ones that just clears the deck for you like insanity, and I thought maybe that's what he was referring to. But no – yes, it definitely goes to his mental state, his mental ability.
>
> The Court: His ability to form the requisite mental intent.
>
> [Defense Counsel]: No. I think that goes to insanity. When you put it like that, that is saying, I have an insanity defense. . . .
>
> The Court: There's a total difference in insanity and the ability to make a mental decision based upon mental defect or mental illness or mental problems short of insanity.
>
> [Defense Counsel]: That's true. It doesn't have to be completely insane. . . .
>
> Now, as far as a right to a fair trial, he has a right to put on a defense. And I think that what he was experiencing that day and his responses are extremely relevant and important for this jury to have as far as our defense.

---

[1](...continued)

I mean that is the bulk of our defense. . . .

The trial court noted that the appellant's trial had been scheduled to begin on January 18, 2006, before being rescheduled for July 10, 2006. The case was then again rescheduled to begin on October 9, 2006. The court further noted that there had been "numerous motions" in the case. The court said, "We've been in court many, many, many times on this. And if there were an issue such as this, there's been ample time to have that matter resolved, not the week, even three or four days before trial." The court complained that although there was ample time for defense counsel to have forwarded a mental defense, "for the first time I'm being told that there's an issue about a mental defense. On trial date." Therefore, the court found that defense counsel had violated Tennessee Rule of Criminal Procedure 12.2 and granted the State's motion to exclude the proof at trial. However, the court allowed the defense to make an offer of proof regarding the doctor's proposed testimony.

During the offer of proof, Dr. Angelillo, a clinical psychologist, testified that defense counsel first contacted him on August 7, 2006, about evaluating the appellant. Dr. Angelillo first interviewed the appellant on August 26, 2006, with a second visit on September 15, 2006. In evaluating the appellant, Dr. Angelillo asked the appellant about his background and administered several tests to the appellant.

Dr. Angelillo stated that during the cognitive tests he administered, he had to explain too many of the questions and "worr[ied] about invalidating the test. That's not the way it's supposed to be given." Dr. Angelillo testified that he would have liked to conduct further testing of the appellant, but he did not have any more time. He explained:

> Right now, what I've gotten, as I stated, is I've got cognitive variables, and I'm drawing from those. I think that those are valid and consistent. But I don't have a whole lot. I've got nothing. No data at all. And in the interest of time, I didn't – I didn't have any more time.

However, Dr. Angelillo determined that the appellant's "cognitive skills are poorly developed." Testing revealed that the appellant had an IQ of 69. Dr. Angelillo said that he administered the Woodcock-Johnson achievement test to the appellant. The doctor explained that the test "actually give[s] you age levels. And the scores were in the area of nine to eleven. I think his highest one was twelve years old . . . as far as age range." Dr. Angelillo said that the appellant's "responses were rather immature developmentally," his thinking was "quite concrete," and "[h]e has trouble entertaining alternatives as to how to solve a problem." Despite the appellant's low IQ score, Dr. Angelillo opined that the appellant was not retarded.

Dr. Angelillo said that because of the appellant's level of cognitive functioning, "[t]hings that are very important to thinking beyond a concrete here and now level . . . are all significantly impaired." He further said,

What it means is when something happens, is that we would hopefully allow ourselves or be given the time to think about what it takes to solve the problem, and if that answer is not or that strategy is not at hand, to entertain other possibilities as to what might – strategy might be used to solve a problem as opposed to responding reflexively, impulsively . . . .

So a person who sees or – excuse me. Not sees. But who can find but one way to solve a problem, if they're backed into a corner, they come out fighting let's say.

And every time they do it, they come out fighting. Would be a person who has trouble with entertaining alternatives.

Dr. Angelillo said that he had examined the crime scene photographs and opined that the scene was "very disorganized." He said that

according to researchers that publish on this, . . . which I've attended workshops and have read, . . . the characteristics of a disorganized crime[] usually entail very little planning, if any. There's no or little attempt to cover things up. There is – I mean basically – that something occurred at that time. And because of their poor cognitive skills and because – because of the stress level, they don't necessarily think as clearly as they would have. And that's not necessarily that clear to begin with.

When defense counsel asked Dr. Angelillo how the appellant would have reacted if he had gone to the victim's house without the intent to commit a crime but was then attacked, Dr. Angelillo responded, "I don't think I can answer that with . . . a great deal of certainty." However, based upon test results, Dr. Angelillo said, "I am more concerned there with his responding when he is frustrated because he doesn't have a way out of a situation." Dr. Angelillo testified that in stressful situations, "I would speculate that his coping skills or his ability to handle that would be compromised."

The court questioned Dr. Angelillo regarding his assessment of the appellant as follows:

The Court:  . . . [T]he way I read your report, Doctor . . . it appeared to me that there were a lot of things in here that you were looking for, but you were still at a speculative – it could be this. It could be that.

[Dr. Angelillo]:  Yes, Judge.

The Court:  It was consistent with this, but it could be something else.

-8-

[Dr. Angelillo]: Yes, Judge.

The Court: Okay. So we don't really know exactly what the problems are. There is some potential for what they could be, but we don't know exactly what they are.

[Dr. Angelillo]: Yeah, Your Honor . . . . I'm able to give some statement about personality variables to – to – because sometimes that can be very consistent. Sometimes not. . . .

Additionally, the trial court pointedly questioned the doctor regarding his specific diagnosis of the appellant and the effect, if any, on his ability to form a mental state:

The Court: Under the law, . . . do you find mental disease or mental defect – the difference in disease or defect. Disease meaning, would that be like . . . .

[Dr. Angelillo]: It's schizophrenia.

. . . .

[Dr. Angelillo]: I think . . . mental defect, historically, Your Honor, has been retardation.

. . . .

But typically, although it's a shady area over history, I take it to mean – and I think that most people do, is that there is a mental defect meaning he's – he's – his I.Q. is – he's mentally retarded, for example. . . .

The Court: Okay. Well, and then in this – and what is the level that qualifies for retardation?

[Dr. Angelillo]: Sixty-nine and below.

The Court: So you're right there on the line?

[Dr. Angelillo]: Yes. But I don't think he's retarded.

You also have to have pretty significant functional deficits. And [the appellant] is able to find his way around. . . .

. . . .

The Court: . . . But as far as disease and defect. I mean, defect meaning, you know, would you look at this I.Q. of sixty-nine and . . . you're not willing to drop and say that he meets retardation or that he's at that level?

[Dr. Angelillo]: No, Your Honor.

. . . .

He's got significant cognitive deficit. The term defect when it has been applied, has been if he was retarded. In my opinion, then it would be easy to say, yes, he's got a defect.

I think that he's got significant impairment.

. . . .

I can tell you that . . . [the appellant] does not have a learning disability. . . .

. . . .

The answer is, there is very, very significant cognitive impairment. The defect would be – I'm sure somebody could sit here and argue and say, well, it's not a defect because he's not retarded, and I would say, well, of course, it is.

. . . .

. . . [W]hether the word's defect or problem, it's there.

Impairment. He's not retarded.

The Court: Well, I guess the next part of the question is, does that mean he lacks the capacity to form the mental state required to constitute an offen[s]e?

[Dr. Angelillo]: Do I think so? No. I don't think so. I think . . . it impacts it. . . .

Following the doctor's testimony, defense counsel argued that without Dr. Angelillo's testimony, the jury would not "understand that there's somebody from nine to eleven years old stuck inside [the appellant's body] that went there that day." Counsel told the trial court that

what we need from this doctor is the appreciation of who he is so that when he is confronted by someone and it is a volatile situation and it is a violent situation not of his causing, but the threat of violence is suddenly present, that he would engage – he would be engaged by this person and not quickly disengage, but continue on, like tussle with the person, get into an argument with them, fight over the knife, try to get the knife from her.

Counsel said that the doctor would show that although someone with a "more mature appreciation of the circumstances" would leave to avoid a violent situation, the appellant would not. Defense counsel argued that such testimony "really goes to the jury's appreciation of how one of the lesser included offenses could certainly be the correct crime found here." Defense counsel specifically stated, "I'm not saying he lacks that ability [to form a mental state]. . . . I'm saying that it is impaired."

Following the offer of proof, the trial court again considered the admissibility of Dr. Angelillo's testimony. The trial court said:

[T]o . . . ask the doctor, these things that you have found, is that consistent with – does that impact . . . what he did out there, how he reacted out there.

. . . I don't think under the law that's permissible based on what the doctor's testified to. And if that's where you're wanting to go with this because that's the way the report is written, I'm not inclined to allow that.

Now, if he's simply going to get up and testify that he gave him some tests and he showed an IQ of sixty-nine and a learning level of third, fourth, and fifth grade, I might be inclined to allow that.

The court further stated that testimony that the appellant might act a certain way because of the impairment was speculative and not relevant. Therefore, the trial court denied the admissibility of Dr. Angelillo's testimony, "not because it violates Rule 12.2, but because I find that it's not relevant." The court was particularly persuaded to exclude the doctor's testimony because he did not say that the appellant was incapable of forming the requisite mental state.

Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). In this regard, Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, even relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

-11-

the jury." Tenn. R. Evid. 403. Further, Tennessee Rule of Evidence 702 requires that expert testimony "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," and Rule 703 requires that the facts or data underlying the expert's opinion be trustworthy. A trial court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In Hall, our supreme court explained "diminished capacity" as follows:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). However, "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." Id. at 690. Put another way, for expert testimony regarding a defendant's mental state to be admissible, the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea. See Hall, 958 S.W.2d at 689-91.

In Hall, our supreme court cautioned that the expert testimony

> must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert . . . testimony on the issue. . . .
>
> . . . .
>
> . . . While evidence that a particular defendant, because of a mental disease or defect, lacks the capacity to form the requisite intent is admissible in Tennessee, expert opinion testimony about the typical reactions of certain personality types is not relevant to the capacity of the particular defendant on trial. Moreover, proof of personality type is not relevant to a defendant's capacity to form the mental intent.

<u>Hall</u>, 958 S.W.2d at 691 (citation omitted); <u>see also</u> <u>State v. Faulkner</u>, 154 S.W.3d 48, 56-57 (Tenn. 2005). Further, the <u>Hall</u> court explained:

> "Society is comprised of myriad individuals with diverse personalities and temperaments who are jointly and severally bound by society's common codes of conduct and responsibility. The mere fact that one is more apt, by personality type, to become emotional in response to a particular stimulus does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be less apt to respond as passionately to the same stimulus. If it did, then each person would be the law unto him or herself based solely upon his or her particular personality makeup."

<u>Hall</u>, 958 S.W.2d at 691-92 (quoting <u>State v. Leroy Hall, Jr.</u>, No. 03C01-9303-CR-00065, 1996 WL 740822, at *18 (Tenn. Crim. App. at Knoxville, Dec. 30, 1996)).

Recently, in <u>State v. Bradley Ferrell</u>, __ S.W.3d __, No. M2005-02552-SC-R11-CD, 2009 WL 200282 (Tenn. at Nashville, Jan. 29, 2009), our supreme court discussed the ruling in <u>Hall</u>. The <u>Ferrell</u> court clarified that the "decision in <u>Hall</u> established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense . . . ." <u>Id.</u> at *6. Our supreme court explained that the <u>Hall</u> holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" <u>Id.</u> (quoting <u>Hall</u>, 958 S.W.2d at 691). The court further explained that "<u>Hall</u> recognized that a defendant may negate an element of the offense as a defense to the prosecution." <u>Id.</u> at *7.

In the instant case, the trial court noted that Dr. Angelillo "said that [the appellant] had significant cognitive immaturity, but he did not say that that caused him an inability to form a mental state." Therefore, the court ruled that "the doctor's testimony is not relevant as to the mental state of [the appellant] at the time of the commission of the offense." On appeal, the appellant acknowledges that at the time of his trial, Tennessee law allowed expert testimony as to a defendant's mental disease or defect to be admissible at trial only if the expert testified that the defendant had a mental disease or defect and because of the mental disease or defect "the defendant's ability to formulate the particular culpable mental state [was negated]. . . ." However, the appellant contends "that the holdings of the definitive and leading cases dealing with this issue are so narrowly decided as to impair the right of the [appellant] to a trial by jury," thereby violating his due process right to present a defense.

The appellant correctly states that a criminal defendant has a right to present witnesses in his defense. <u>State v. Brown</u>, 29 S.W.3d 427, 432 (Tenn. 2000). However, our supreme court has explained:

Although "[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process." Specifically, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."

Id. (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 302, 93 S. Ct. 1038, 1046, 1049 (1973)). Even considering the accused's right to present a defense, the testimony offered by the witness must be relevant, reliable, and material. See id. at 434; State v. Frank Lee Tate, No. W2004-01041-CCA-R3-CD, 2007 WL 570555, at *12 (Tenn. Crim. App. at Jackson, Feb. 23, 2007), perm. to appeal denied, (Tenn. 2007).

The Hall/Faulkner test was designed to ensure that the testimony regarding a defendant's mental state is relevant to negate the existence of the requisite mental state. Thus, the test necessarily takes into consideration the concerns embodied by a defendant's due process rights to present a defense. Our supreme court's recent decision in Ferrell further affirms that the Hall holding requires that the expert testimony is admissible if it indicates that the defendant lacked the capacity to form the requisite mental state. See Ferrell, __ S.W.3d __, No. M2005-02552-SC-R11-CD, 2009 WL 200282, at *7.

In the instant case, Dr. Angelillo's testimony was not offered to negate the requisite mental state, but to show that the appellant's cognitive impairments impacted his ability to react appropriately in certain situations. Dr. Angelillo explained his assessment, stating that he was concerned with the appellant "responding when he is frustrated because he doesn't have a way out of the situation. . . . . In this case, for [the appellant] to respond, in a frustrated perhaps angry way, I think would be increased, as compared to the, quote, average person."

As we previously noted, our supreme court has cautioned that

"The mere fact that one is more apt, by personality type, to become emotional in response to a particular stimulus does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be less apt to respond as passionately to the same stimulus."

Hall, 958 S.W.2d at 692 (quoting Hall, No. 03C01-9303-CR-00065, 1996 WL 740822, at *18). Dr. Angelillo's testimony basically reflected that the appellant was easily frustrated and likely to act inappropriately in stressful situations. In Faulkner, our supreme court

"emphasize[d] that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular

-14-

emotional state or mental condition. It is the showing of a lack of
capacity to form the requisite culpable mental intent that is central to
evaluating the admissibility of expert . . . testimony on the issue."

Faulkner, 154 S.W.3d at 56-57 (quoting Hall, 958 at 690). Therefore, we conclude that the trial court correctly ruled that Dr. Angelillo's proposed testimony was irrelevant and inadmissible.

### B. Curative Instruction

The appellant complains that the trial court "committed plain error by failing to instruct the jury to disregard the testimony of Josie Moss about the [victim] telling her that her phones were off the hook."

At trial, Moss testified that on the morning of the victim's death, the victim told Moss that "all the phones is off the hook." Moss said that as they were talking, the victim's telephone "cut off." Following this testimony, defense counsel objected to Moss' testimony on the basis that it was hearsay and the victim could not be cross-examined. The State responded that it would move to another question. The trial court sustained the objection. No curative instruction was requested or given.

On appeal, the appellant concedes that he did not request a curative instruction. Ordinarily, the right to a curative instruction is waived when such instruction is not requested. State v. McPherson, 882 S.W.2d 365, 371 (Tenn. Crim. App. 1994); see also Tenn. R. App. P. 36(a). Regardless, the appellant contends that the trial court's failure to give a curative instruction was plain error.

Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court;
> b) a clear and unequivocal rule of law must have been breached; c) a
> substantial right of the accused must have been adversely affected; d)
> the accused did not waive the issue for tactical reasons; and e)
> consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The appellant contends that the lack of a curative instruction, coupled with the State's closing argument, so prejudiced the appellant as to render the lack of a curative instruction plain error. The appellant maintains that

> [d]uring its closing argument, the prosecution argued forcefully that the [appellant] was not invited into [the victim's] home when he knocked on the door; but, rather, that he entered without permission as an intruder. . . . Thus, at the outset of the trial below, this seed of innuendo and speculation that the [appellant] was an intruder unlawfully in [the victim's] home from the beginning was sowed. The manner in which this was accomplished was the deliberate injection of this incompetent hearsay statement by Ms[.] Moss about what [the victim] allegedly told her about phones being off the hook.

Our review of the record reveals that in closing argument, the State contended that the victim had not been safe in her own home and that she had the "right to be in her own home without unwanted intruders." The State also argued that after breaking up with Fason, the appellant was no longer welcome at the victim's home nor did he have a legitimate reason to be there. The State contended that the appellant brutally attacked and tied up the victim. The State maintained that the physical proof did not comport with the appellant's statement of events, especially given the brutality and force require to inflict some of the wounds. The State mentioned that the victim's mother was not being disingenuous when she testified that she was concerned when "she thought the phone was off the hook because she kept calling and nobody was there[.]"

We conclude that all of the factors for finding plain error are not present. First, there is nothing in the record to indicate that the appellant's failure to request a curative instruction was not tactical to avoid calling attention to the contested testimony. Moreover, our reading of the State's closing argument reveals that the State did not improperly rely on the contested statement. Further, in our view, the trial court's failure to sua sponte give a curative instruction would have had minimal, if any, impact on the trial. Additionally, the jury's verdict of second degree murder indicates that the jury did not believe the State's theory that the appellant went to the victim's home with the intention of killing the victim, further demonstrating that correction of the alleged error is not necessary to do substantial justice. Therefore, we conclude that the trial court's failure to sua sponte give a curative instruction was not plain error.

### C. Sequential Instructions

The appellant next complains that the trial court instructed the jury that it must acquit the appellant of the greater, charged offense before considering lesser-included offenses. In the instant case, the trial court instructed the jury that they were to first inquire as to the appellant's guilt of the charged offense of first degree murder. The instruction provided that if the jury found the appellant guilty of first degree murder, they were to return a verdict of guilt. The instructions further provided:

> If you find the [appellant] not guilty of this offense or if you have a reasonable doubt as to his guilt, you will acquit him thereof and then proceed to inquire whether he is guilty of murder in the second degree as included in the first count of the indictment.

The trial court continued to give "acquittal-first" instructions throughout the remainder of the lesser-included offense instructions. The appellant contends that this procedure precludes the jury from considering lesser-included offenses, thereby effectively denying the appellant his right to trial by jury.

Since the inception of the instant appeal, our supreme court has explicitly addressed the constitutionality of sequential, acquittal-first jury instructions. See State v. Davis, 266 S.W.3d 896 (Tenn. 2008). In Davis, our supreme court held that

> while a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered. Our constitution also does not prohibit the requirement that a jury first reach a unanimous verdict of acquittal with respect to a greater offense before it proceeds to consider a defendant's guilt of a lesser-included offense.

Id. at 905. In sum, our supreme court determined that an acquittal-first instruction does not offend a defendant's right to a jury trial under the Tennessee Constitution. Id. Therefore, this issue is without merit.

## D. Sentencing

The final issue concerns the sentence imposed by the trial court. The appellant maintains that the record does not clearly reflect whether the trial court applied the sentencing statutes in effect at the time of the commission of the offense or the 2005 amendments to the sentencing statutes. The appellant argues that the pre-2005 sentencing statutes should have been applied in the instant case; therefore, the trial court violated the dictates of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), by enhancing his sentence using factors not reflected by the jury verdict.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2006). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the appellant in his own behalf. See Tenn. Code Ann. §§ 40-35-102, -103,

-17-

-210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The instant crime was committed on August 7, 2004. For offenses committed prior to June 7, 2005, sentencing was governed by prior law, which provided for "presumptive" sentences. The presumptive sentence was the midpoint in the range for Class A felonies and the minimum in the range for all remaining felonies. See Tenn. Code Ann. § 40-35-210(c), (d) (2003). Trial courts then were to enhance and/or mitigate a defendant's sentence based upon the application of enhancement and mitigating factors. See Tenn. Code Ann. § 40-35-210(d), (e) (2003).

In Blakely, the United States Supreme Court concluded that the "'statutory maximum' for Apprendi[ v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 at 303, 124 S. Ct. at 2537; see also Gomez v. Tennessee, 549 U.S. 1190, 127 S. Ct. 1209 (2007). In response to Blakely, our legislature amended Tennessee's sentencing scheme and eliminated presumptive sentences. The Compiler's Notes to Tennessee Code Annotated section 40-35-210 (2006) provide that

> for defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, the defendant may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections. Upon executing such a waiver, all provisions of the act shall apply to the defendant.

The appellant correctly notes that the trial court did not explicitly state whether it was sentencing the appellant pursuant to the prior sentencing statute or the new sentencing provisions. However, because the record does not reflect that the appellant executed a written waiver of his ex post facto protections, the trial court was required to sentence the appellant under the prior sentencing law. See State v. Jarvis Harris, No. W2006-02234-CCA-R3-CD, 2007 WL 2409676, at *11 (Tenn. Crim. App. at Jackson, Aug. 24, 2007), perm. to appeal denied, (Tenn. 2008).

In the instant case, the trial court found that the appellant treated the victim with exceptional cruelty during the commission of the offense, specifically noting that the victim suffered a significant number of wounds and that the "punctate" wounds indicated that the victim had been tortured. See Tenn. Code Ann. § 40-3.5-114(5) (2006). Under Blakely, that factor may not be used absent a finding by a jury or an admission by the appellant. There was no jury finding or admission in this case. Therefore, given that the appellant had no prior convictions, the court was not authorized to impose a sentence higher than the presumptive minimum.

Because the appellant's conviction, second degree murder, is a Class A felony, the presumptive sentence was twenty years. Tenn. Code Ann. §§ 40-35-112(a)(1), 40-35-210(c) (2003).

The court stated that the crime warranted the maximum available sentence. However, the trial court determined that under the catch-all provision of Tennessee Code Annotated section 40-35-113(13), Dr. Angelillo's testimony concerning the appellant's "mental situation and conditions" should apply to mitigate the sentence by one year. Thus, we conclude that the presumptive sentence in the instant case, twenty years, should be reduced one year for a sentence of nineteen years.

### III. Conclusion

Based upon the foregoing, we conclude that the trial court did not err in excluding the expert testimony, failing to instruct the jury to disregard a hearsay statement, or giving a sequential, "acquittal-first" instruction to the jury. However, we find that the trial court erred by imposing a twenty-four-year sentence, therefore, we modify the sentence to nineteen years and remand for the entry of a judgment reflecting the modified sentence. In all other respects, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE